

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-25-1999

# DeSousa v. Reno

Precedential or Non-Precedential:

Docket 99-1115

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"DeSousa v. Reno" (1999). *1999 Decisions.* Paper 232.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/232

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 25, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1115

FERNANDO JORGE DESOUSA

v.

JANET RENO, Attorney General;
DORIS MEISSNER, Commissioner of Immigration
and Naturalization Service;
IMMIGRATION AND NATURALIZATION SERVICE;
DEPARTMENT OF JUSTICE;
J. SCOTT BLACKMAN,
Acting District Director,

       Appellants

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 98-01470)
District Judge: Honorable Anita B. Brody

Argued July 13, 1999

BEFORE: GREENBERG, ALITO, and ROSENN,
Circuit Judges

(Filed: August 25, 1999)

       Martin A. Kascavage (argued)
       Schoener & Kascavage
       400 Market Street, Suite 420
       Philadelphia, PA 19106

       Attorneys for Appellee

David W. Ogden
Acting Assistant Attorney General
Civil Division
Christopher C. Fuller
Senior Litigation Counsel
Michael P. Lindemann
Edward J. Duffy (argued)
Attorneys
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

 Attorneys for Appellants

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

Fernando Jorge DeSousa, seeking to avoid deportation
for crimes he committed while a legal resident of the United
States, applied for a discretionary waiver of inadmissibility
under former 8 U.S.C. S 1182(c). The Board of Immigration
Appeals ("BIA") ruled that as a deportable, rather than an
excludable, alien, DeSousa was not eligible for a
discretionary waiver. DeSousa then filed a petition for
habeas corpus in the district court against the Attorney
General and the Immigration and Naturalization Service
("INS"), arguing that former S 1182(c), as applied by the
BIA, violated the equal protection guarantee of the Fifth
Amendment's Due Process Clause by irrationally
distinguishing between aliens in deportation and in
exclusion proceedings. The district court concluded that it
had habeas corpus jurisdiction to hear DeSousa's claims
and granted him a writ based on his equal protection
challenge. Although we agree with the district court that
recent changes in the immigration laws have not eliminated
district courts' habeas jurisdiction over deportation-related

claims, at least in cases such as this in which deportation proceedings were instituted before April 1, 1997, the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), we find that S 1182(c), as interpreted by the BIA, does not violate the Fifth Amendment's equal protection guarantee and therefore will reverse.

## II. JURISDICTION

DeSousa claims that the district court had subject matter jurisdiction over his habeas petition under 28 U.S.C. S 2241. Whether changes in the immigration laws eliminated the district court's habeas jurisdiction over DeSousa's deportation-related challenge is the first issue presented by this appeal and is discussed fully below. We have appellate jurisdiction under 28 U.S.C. S 1291 over the district court's final order granting DeSousa relief.

## III. FACTS AND PROCEEDINGS

Fernando Jorge DeSousa, a citizen of Portugal, entered the United States as a lawful permanent resident in December 1969. In the 1970s, 1980s and early 1990s, DeSousa was convicted of various crimes including aggravated assault, recklessly endangering another person, burglary and theft. For his second aggravated assault conviction in 1992, DeSousa served four and one-half years in prison. He was released from prison on December 15, 1996.

As an alien convicted of two crimes of moral turpitude and also as an aggravated felon, DeSousa became subject to deportation under the Immigration and Nationality Act ("INA") S 241(a)(2)(A)(ii), 8 U.S.C.S 1251(a)(2)(A)(ii) (two crimes of moral turpitude), and S 241(a)(2)(A)(iii), 8 U.S.C. S 1251(a)(2)(A)(iii) (aggravated felony). 1 On October 28, 1996, the INS issued an order to DeSousa to show cause

_____

1. These sections are now renumbered as #8E8E # 237(a)(2)(A)(ii) and 237(a)(2)(A)(iii) and codified at 8 U.S.C. SS 1227(a)(2)(A)(ii) and 1227(a)(2)(A)(iii).

3

why he should not be deported because of his criminal convictions.

At his immigration hearing, DeSousa sought to prevent his deportation by applying for a discretionary waiver of inadmissibility under former S 212(c) of the INA, codified at 8 U.S.C. S 1182(c) (repealed 1996). At the time of DeSousa's convictions, S 212(c) permitted the Attorney General, in her discretion, to issue waivers to legal aliens who had traveled abroad voluntarily and were seeking entry back into the country but who would be excludable based on their criminal convictions. See former 8 U.S.C.S 1182(c) (1990).[2] Although the waiver provision applied on its face only to aliens in exclusion proceedings, the BIA and federal courts routinely had applied it to aliens in deportation proceedings as well. See, e.g., Katsis v. INS, 997 F.2d 1067, 1070 (3d Cir. 1993); Francis v. INS, 532 F.2d 268, 273 (2d Cir. 1976).[3]

_____

2. The version of S 212(c) as amended in 1990 provided in relevant part:

> Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General [despite being otherwise excludable].... The first sentence of this subsection shall not apply to an alien who has been convicted of an aggravated felony and has served a term of imprisonment of at least 5 years.

8 U.S.C. S 1182(c) (1990). Then the last sentence was amended further in 1991 to provide that: "The first sentence of this subsection shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years." 8 U.S.C. S 1182(c) (1991). We see no material difference between the two versions, at least in the context of this case.

3. It must be said that this application was sometimes questioned. See Morel v. INS, 90 F.3d 833, 842 (3d Cir. 1996) (Greenberg, J., dissenting opinion). At the time of the events at issue in this appeal, deportable aliens were defined in 8 U.S.C. S 1251(a) as those aliens who resided within the United States but who could be deported for certain reasons. In contrast, excludable aliens were defined in 8 U.S.C. S 1182(a) as those aliens who could be denied entry into the United States. IIRIRA, however, eliminated distinctions between exclusion and deportation proceedings. Under the current statutory structure, an immigration

Moreover, at the time of DeSousa's latest conviction in 1992, S 212(c) waivers were unavailable only to those aliens who had been convicted of an aggravated felony, and who had served a term of imprisonment of at least five years for such felonies. See former 8 U.S.C. S 1182(c) (1990). Although DeSousa's convictions qualified as aggravated felonies, see 8 U.S.C. S 1101(a)(43) (1990), he nevertheless would have been eligible for a waiver under the previous version of S 212(c) because he had served a prison term of only four and one-half years for his convictions.

The immigration judge found, however, that DeSousa was not eligible for the waiver under the new version ofS 212(c) enacted by S 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996). As amended, S 212(c) precludes "deportable" aliens who have been convicted of an aggravated felony or two crimes of moral turpitude from receiving waivers of inadmissibility, regardless of the prison term served for such crimes. See AEDPA S 440(d).4

The BIA affirmed the immigration judge's decision. Although DeSousa argued that new S 212(c) violated his right to equal protection by withdrawing waivers only from
_____

judge determines an alien's right either to be admitted to or to remain in the United States in a removal proceeding. See 8 U.S.C. S 1229a. Similarly, there is now a single provision, equally applicable to all aliens, that permits the Attorney General, in her discretion, to "cancel" the removal of an alien. See 8 U.S.C. S 1229b.

4. AEDPA S 440(d), as itself amended byS 306(d) of the IIRIRA, amended INA S 212(c) to read:

> The subsection shall not apply to an alien who is deportable by reason of having committed any criminal offense covered in [INA] S 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section
> 241(a)(2)(A)(ii) for which both predicate offenses are, without regard
> to the date of their commission, otherwise covered by section
> 241(a)(2)(A)(i).

Five months after the passage of AEDPA, Congress repealed S 212(c) in its entirety, effective April 1, 1997. See IIRIRA S 304(b). Because DeSousa's deportation proceedings were initiated in 1996, this repeal does not affect his case.

aliens in deportation proceedings, rather than from those in exclusion proceedings, the BIA, stating that it could not rule on the constitutionality of laws enacted by Congress, did not consider this argument on the merits.

DeSousa then brought a habeas corpus proceeding in the district court under 28 U.S.C. S 2241 challenging the BIA's final order. See DeSousa v. Reno, 30 F. Supp.2d 844 (E.D. Pa. 1998). First, he contended that the BIA had erred in applying the new S 212(c) to him because his criminal convictions predated AEDPA's amendment of the statute. Second, DeSousa argued that even if new S 212(c) did apply to pre-AEDPA convictions, it violated the Fifth Amendment's equal protection guarantee by preventing only aliens in deportation proceedings, rather than those in exclusion proceedings, from applying for waivers. Thus, DeSousa sought an order directing the BIA to consider and rule on the merits of his application for a S 212(c) waiver. The Attorney General and the INS opposed DeSousa's application for a writ, arguing primarily that AEDPA as well as IIRIRA had eliminated habeas corpus jurisdiction over deportation-related claims.

After a de novo review of a magistrate judge's report and recommendation, the district court granted a writ to DeSousa. It concluded first that neither AEDPA nor IIRIRA had eliminated its habeas jurisdiction over cases like DeSousa's. See DeSousa, 30 F. Supp.2d at 849. Then, it found that AEDPA S 440(d), which amended the INA waiver of inadmissibility provision, applied to cases pending at the time of its enactment and therefore also applied to DeSousa even though his criminal convictions predated AEDPA's effective date. See id. at 855. The court also ruled, however, that the amended S 212(c) violated DeSousa's right to equal protection of the law by drawing an irrational distinction between aliens subject to exclusion and those subject to deportation. See id. at 857. The Attorney General and the INS appeal, arguing that the court erred in finding habeas jurisdiction, and that even if such jurisdiction exists, S 212(c) is constitutional.

6

IV. DISCUSSION

A. Standard of Review

The district court's conclusion that AEDPA and IIRIRA did not eliminate habeas corpus jurisdiction over all deportation-related claims and that S 440(d) applies to pre-AEDPA convictions relies on statutory interpretation, which we review de novo. See Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 202 (3d Cir. 1998). We also afford de novo review to the district court's conclusions regarding the constitutionality of S 440(d). See Anker Energy Corp. v. Consolidation Coal Co., 177 F.3d 161, 169 (3d Cir. 1999).

B. Did the District Court Have Jurisdiction Under 28 U.S.C. S 2241 to Review DeSousa's Habeas Petition Challenging His Final Deportation Order on Constitutional and Statutory Grounds?

Recognizing that we recently have addressed the availability of habeas corpus jurisdiction after AEDPA and IIRIRA, the Attorney General and INS argue that a later Supreme Court decision requires us to reconsider our opinion in Sandoval v. Reno, 166 F.3d 225 (3d Cir. 1999). In Sandoval, as in this case, an alien sought habeas corpus review of a deportation order approved by the BIA. We held that the district courts continued to have habeas corpus jurisdiction to review deportation orders despite changes in the law created by AEDPA and IIRIRA. See Sandoval, 166 F.3d at 238. The Attorney General and INS claim that Reno v. American-Arab Committee, 119 S.Ct. 936 (1999), undermines this conclusion.

1. Sandoval v. Reno

In Sandoval, we addressed a case nearly identical to this one. Sandoval, like DeSousa, had petitioned for a writ of habeas corpus in a district court seeking relief from a deportation order. See Sandoval, 166 F.3d at 228. Because the effective date of most IIRIRA provisions was April 1, 1997, and because Sandoval was placed in deportation proceedings before that date, Sandoval, like DeSousa, was not subject to IIRIRA's permanent rules. See id. at 229 n.1.

7

He was, however, subject to its transitional rules, and arguably to at least some of AEDPA's provisions, as that act became effective in April 1996, while Sandoval's case still was pending in the immigration courts. See id.

The respondents in Sandoval argued that provisions in the new statutes precluded habeas corpus jurisdiction in a district court over aliens' challenges to deportation orders. See id. at 232–38. Relying on Supreme Court precedent establishing that only a clear statement of congressional intent could eliminate a statutory grant of jurisdiction to the district courts, we concluded that none of the provisions the respondents cited ended habeas corpus jurisdiction in cases like Sandoval's. See id. at 238. On this appeal, the Attorney General and the INS do not quarrel with this court's interpretation of two of the provisions discussed in Sandoval, AEDPA S 401(e) and IIRIRA S 309(c)(4)(G), a transitional rule. They do claim, however, that American–Arab requires this court to reconsider its construction of the other provision at issue in Sandoval, IIRIRA's amendment of INA S 242(g).

IIRIRA S 306(a) amended INA S 242(g) to provide:

> (g) Exclusive Jurisdiction.
>
> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. S 1252(g) (1999). Unlike IIRIRA's other provisions, S 242(g) explicitly applies "to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings." IIRIRA S 306(c)(1). Thus, although IIRIRA's permanent rules generally do not apply to individuals like DeSousa and Sandoval, whose deportation proceedings were initiated before IIRIRA's effective date, even they are subject to new S 242(g). See Sandoval, 166 F.3d at 230. We ruled in Sandoval, however, that amendedS242(g) did not eliminate habeas corpus jurisdiction because it did not contain express language ending such jurisdiction. See id.

8

at 236-38. The Attorney General and INS argue that the American-Arab decision has undermined this holding. We disagree.

2. Reno v. American-Arab Committee

The issue before the Supreme Court in American-Arab was whether S 242(g) had deprived the federal courts of jurisdiction to review the respondents' claim that the Attorney General was selectively enforcing the immigration laws. See American-Arab, 119 S.Ct. at 940. After the government had instituted deportation proceedings against them, the respondents in American-Arab brought suit in a district court, challenging the constitutionality of a relevant statute, and seeking declaratory and injunctive relief against the Attorney General, the INS, and various immigration officials. See id. at 938-39. Eventually, the respondents amended their complaint to include a claim that the government had targeted them for deportation, in violation of their First Amendment rights, because of their participation in the Popular Front for the Liberation of Palestine, a group that the government "characterizes as an international terrorist and communist organization." Id. at 938, 939. The respondents argued that the government did not enforce routine status requirements against immigrants who were not members of disfavored terrorist groups. See id. at 939.

In addressing whether S 242(g) deprived the district court of jurisdiction over respondents' selective enforcement claim, the Supreme Court stated that the new section applies to cases that involve three specific decisions made by the executive: decisions to "commence proceedings, adjudicate cases, or execute removal orders." See id. at 943 (emphasis by Supreme Court). The Court stated that it made sense for Congress to target these three stages because at each stage the INS has discretion to abandon the endeavor, and at the time S 242(g) was enacted, the INS routinely had been defending suits challenging its exercise of discretion in deportation cases. See id. at 943-44. These suits stemmed from the INS's practice of "deferred action": its willingness to choose not to deport based on humanitarian reasons or for its own convenience. See id. at

9

943. Those individuals who failed to benefit from such discretion were challenging the INS's decisions, and therefore, the Supreme Court reasoned, Congress had sought to preclude such suits. See id. at 944. The Court stated: "Section [242(g)] seems clearly designed to give some measure of protection to `no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed." Id. Thus, the Court found that S 242(g) was a narrow provision, "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." Id. at n.9.

The Attorney General and INS argue in this case that S 242(g) precludes DeSousa's habeas corpus suit even though DeSousa brought a constitutional and statutory challenge in his petition rather than a selective enforcement claim. They claim that S 242(g) bars DeSousa's suit because the suit, in essence, seeks to stop the government from "executing" a deportation order. Clearly, then, they view S 242(g) as an extremely broad provision that would apply to every deportation-related challenge, because every such challenge could be deemed a suit to stop the "execution" of a deportation order.5

The Supreme Court, however, explicitly rejected a broad interpretation of S 242(g) in American-Arab. As in this case, the Attorney General argued in American-Arab that S 242(g)

_____

5. It is possible that the Attorney General and INS are making a different argument and suggesting that because DeSousa ultimately seeks a discretionary waiver of inadmissibility, his case is covered by S 242(g). It is true that the government's refusal to grant DeSousa a S 212(c) waiver, if he were eligible for such a waiver under the statute, might be the kind of discretionary decision that S 242(g) was designed to protect. Currently, however, the unavailability of the waiver to DeSousa does not depend on governmental discretion and instead is required by the language of the statute itself. Thus, by challenging the statute's constitutionality and its alleged retroactivity, DeSousa is not challenging the government's exercise of discretion. He merely seeks to have us interpret the statute in his favor and then send his case back to the BIA for consideration of his application for a waiver.

10

requires aliens "to bring all deportation-related claims in the context of a petition for review of a final order of deportation filed in the court of appeals." Id. at 941 (emphasis added). The heart of the Court's opinion was the rejection of this interpretation because it would have rendered IIRIRA's effective date provision, S 309(c)(1), a nullity. See id. at 941-43. The Court reasoned that because IIRIRA S 306 instructs that S 242(g) applies to previous and pending cases, to interpret S 242(g) as applying to all deportation-related claims would render senseless S 309(c)(1), which states that IIRIRA generally does not apply to previous or pending cases. See id. According to the Court, the only interpretation that squared S 306 and S 309 was one that viewed S 242(g) as affecting a narrow class of cases. See id. at 943. Thus, the Supreme Court in American-Arab clearly rejected the interpretation of S 242(g) that the Attorney General and INS advance here.

Because S 242(g) only applies to suits challenging the government's selective enforcement of the immigration laws, and because DeSousa's case was not brought on this ground, S 242(g) does not bar his suit. See Richardson v. Reno, ___ F.3d ___, 1999 WL 496241, at *2 (11th Cir. July 14, 1999) (interpreting American-Arab and ruling that S 242(g) did not bar a habeas corpus petition that did not challenge a decison to commence proceedings, adjudicate cases or execute removal proceedings).6  As S 242(g) does not apply to DeSousa, and American-Arab did not affect the remainder of Sandoval's rulings, Sandoval remains the law governing cases like DeSousa's. Under Sandoval, the district court had jurisdiction to consider DeSousa's habeas

_____

6. Richardson held that habeas jurisdiction was not available in that case but predicated its opinion on post-IIRIRA law as Richardson was placed in removal proceedings after IIRIRA's effective date. See Richardson 1999 WL 496241, at *6 n.2. Accordingly, Richardson  distinguished Sandoval because Sandoval was a pre-IIRIRA case so that only the IIRIRA transitional provisions applied. Id. Thus, the Richardson court explained that Sandoval did "not involve the full, and extensive, revisions to the INA's judicial review scheme" under INA S 242 as amended by IIRIRA. This case, like Sandoval, also involves only IIRIRA transitional rules. Therefore, we have no reason to consider whether we agree with Richardson.

11

petition, including both his constitutional and statutory claims. See Sandoval, 166 F.3d at 238.

## C. Does New S 212(c) Violate DeSousa's R ight to Equal Protection of the Law?

DeSousa argues, and the district court found, that new S 212(c) is unconstitutional because it irrationally distinguishes between aliens in exclusion and in deportation proceedings. We disagree.

DeSousa's equal protection challenge to amendedS 212(c) stems from the BIA's decision in a different case, Matter of Fuentes-Campos, Interim Decision 3318 (BIA 1997). In Fuentes-Campos, the BIA addressed whether the amendment to S 212(c) prohibiting "deportable" aliens with aggravated felony or multiple moral turpitude convictions from applying for waivers also applied to aliens in exclusion proceedings. Focusing on the term "deportable" in the amendment, the BIA ruled that new S 212(c) only barred aliens in deportation proceedings, and not those in exclusion proceedings, from applying for waivers. On this appeal, both the Attorney General and DeSousa acquiesce in the BIA's interpretation of Congressional intent in amending the statute. Because of the parties' agreement on this issue, we assume, without deciding, that the BIA correctly construed S 212(c) when it concluded that only aliens in deportation proceedings convicted of the specified crimes are barred from applying for discretionary waivers.[7] We therefore turn to address whether Congress's decision

_____

7. Our decision not to question the BIA's conclusions in Fuentes-Campos is also influenced by the fact that S 212(c)'s amended version was in force for a limited time. Because IIRIRA repealed this section in its entirety and replaced it with new INA S 240(a), which permits discretionary "cancellation of removal" and explicitly applies to all criminal aliens, amended S 212(c) was only in effect from the date of AEDPA's passage on April 24, 1996, until the effective date of IIRIRA, April 1, 1997. See IIRIRA S 304(a) (repealing former S 212(c) in its entirety effective April 1, 1997); 8 U.S.C. S 1229b(a) (codifying new INA S 240(a)). We do note, however, that at least one court of appeals has found the BIA's construction of S 212(c) to be clearly contrary to the plain meaning of the statute. See United States v. Estrada-Torres, 179 F.3d 776, 779 (9th Cir. 1999).

to distinguish between deportable and excludable aliens violates DeSousa's right to equal protection of the laws.

DeSousa's equal protection argument rests primarily on his claim that from the time that the Court of Appeals for the Second Circuit decided Francis, courts have recognized without exception the irrationality of distinguishing between deportable and excludable aliens. A careful reading of Francis, however, reveals that it did not directly concern distinctions between excludable and deportable aliens, but rather addressed disparate treatment of groups of deportable aliens. Indeed it appears that over the years, by force of repetition, Francis has come to stand for a rule of law that its facts do not support.

In Francis, the court of appeals considered a series of decisions by the BIA that had extended S 212(c) relief, which on its face applied only to aliens in exclusion proceedings, to certain aliens in deportation proceedings. First, in Matter of G. A., 7 I. & N. 274 Dec. (1956), the BIA found an alien eligible for S 212(c) relief because he had left temporarily and then returned to the United States after he had become deportable. See Francis, 532 F.2d at 271. The BIA reasoned that since the alien would have been eligible for S 212(c) relief if the INS had placed him into exclusion proceedings at the time he sought reentry, relief could be granted at his later deportation hearing. See id. Second, in Matter of Smith, 11 I. & N. Dec. 325 (1965), the BIA construed S 212(c) to apply to deportation proceedings where an alien had requested an adjustment of status under S 245 of the INA. See id. It concluded that because the S 245 application subjected the alien to all bases for exclusion, the alien should also benefit from the waiver available in exclusion proceedings. See id. At the same time, however, the BIA continued to refuse to grant S 212(c) relief to an individual who did not fall into one of the above two groups of deportable aliens. See id.

The petitioner in Francis argued that through its interpretations, the BIA had created two classes of aliens identical in every respect except for the fact that, after becoming deportable, members of one class had departed and returned to this country without being stopped at the border. See id. at 272. He claimed that the BIA's extension

13

of S 212 relief to certain deportable aliens and not others violated his right to equal protection. The Francis court agreed with the petitioner's claim, finding that there was no rational basis for rewarding with a potential waiver only those deportable aliens who temporarily left the country and returned without triggering exclusion proceedings at the border.

But distinguishing between groups of deportable aliens is, of course, not the issue in this appeal. Instead, the issue we must decide, whether Congress can constitutionally differentiate between excludable and deportable aliens, simply was not addressed in Francis. Similarly, although we have adopted the reasoning of Francis, this adoption should stand for no more than Francis itself represented: the conclusion that the distinctions drawn by the BIA among certain deportable aliens were irrational. See, e.g., Katsis v. INS, 997 F.2d at 1070. In this appeal we therefore are confronted with addressing, for the first time, whether a Congressional grant of discretionary relief to excludable, but not deportable, aliens violates the Fifth Amendment's equal protection guarantee.

It is undisputable that our constitution provides due process and equal protection guarantees to aliens as well as citizens. See Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070 (1886). But as DeSousa concedes and as the Francis court recognized, disparate treatment of different groups of aliens triggers only rational basis review under equal protection doctrine. See Francis, 532 F.2d at 272. Under this minimal standard of review, a classification is accorded "a strong presumption of validity" and the government has no obligation to produce evidence to sustain its rationality. Heller v. Doe, 509 U.S. 312, 319, 320, 113 S.Ct. 2637, 2642, 2643 (1993). Indeed, such a classification can be upheld as constitutional even when it is based on rational speculation rather than on empirical data. See id., 509 U.S. at 320, 113 S.Ct. at 2643. Once a facially legitimate reason for the classification is found, whether such a reason was articulated by Congress or not, we must rule the classification constitutional. See id., 509 U.S. at 320, 113 S.Ct. at 2642. As always, when performing such review, our role is not to judge the wisdom or fairness

14

of Congress's policy choices, but rather their constitutionality. See id., 509 U.S. at 319, 113 S.Ct. at 2642.

The legislative history of AEDPA clearly demonstrates that Congress's goal in amending S 212(c) was to enhance "the ability of the United States to deport criminal aliens." H.R. Conf. Rep. No. 104–518, at 119 (1996), reprinted in 1996 U.S.C.C.A.N. 924, 952.8 In order to aid the United States in expelling criminal aliens from the country, Congress rationally could have decided to encourage such aliens to voluntarily leave the country as a carrot to a potential waiver of removal when they sought reentry. Creating such an incentive may have appeared desirable to Congress for several reasons. First, Congress could have rationally speculated that not all aliens who voluntarily left the country would return. Second, because exclusion

_____

8. Indeed, the history of Congress's amendments to S 212(c) shows that, throughout the 1990s, it had been tightening the controls over granting such waivers. Before 1990, S 212(c) contained no bar to seeking a discretionary waiver. Thus, as the section was applied through case law, all aliens in deportation and exclusion proceedings, even those convicted of aggravated felonies, were eligible to apply for a waiver. See Scheidemann v. INS, 83 F.3d 1517, 1519 (3d Cir. 1996). In 1990, however, Congress enacted an amendment restricting the availability of S 212(c) relief. See Immigration Act of 1990, Pub.L. No. 101–649, S 511(a), 104 Stat. 4978, 5052 (1990). Under the new amendment, aliens who had been "convicted of an aggravated felony and ha[d] served a term of imprisonment of at least 5 years" were barred from applying for waivers. 8 U.S.C. S 1182(c) (1990). There was a further immaterial amendment in 1991. See note 2, supra.

Moreover, in 1990 and 1994, Congress expanded the definition of "aggravated felony" to include more classes of crimes. See Immigration Act of 1990, Pub.L. No. 101–649, S 501(a), 104 Stat. 4978, 5048 (1990); Immigration and Nationality Technical Corrections Act of 1994, Pub.L. No. 103–416 S 222(a), 108 Stat. 4305, 4322 (1994). These amendments rendered an even greater number of aliens ineligible for discretionary relief. Finally, with the passage of AEDPA in 1996, Congress enacted the latest version of S 212(c), which is at issue in this appeal. This version makes waivers unavailable to all aliens who are "deportable" by reason of having committed an aggravated felony or at least two crimes of moral turpitude, regardless of the time served for such crimes. See 8 U.S.C. S 1182(c) (1996).

15

proceedings provide fewer procedural protections than deportation proceedings, Congress may have reasoned that encouraging aliens to seek waivers through the exclusion process would decrease the United States' administrative costs in expelling criminal aliens. See Landon v. Plasencia, 459 U.S. 21, 26–27, 103 S.Ct. 321, 325–26 (1982). We recognize that such a policy might appear callous to the affected individuals and their families. But, because there is a rational reason for distinguishing between deportable and excludable criminal aliens in the context of Congress's policy to expel such aliens from the country, the distinction drawn in S 212(c) does not violate DeSousa's right to equal protection of the law. See LaGuerre v. Reno, 164 F.3d 1035, 1041 (7th Cir. 1998) (rejecting, on similar grounds, identical equal protection challenge to amendedS 212(c)).

D. Alternatively, Is New S 212(c) Impermissibly
   Retroactive When Applied to DeSousa?

DeSousa argues that even if we reverse the district court's equal protection ruling, we can affirm on the alternate ground that amended S 212(c) is retroactive as applied to him. But DeSousa's mention of the retroactivity argument in his appellate brief substantially is limited to two short sentences that state: "[T]his Court can affirm the decision of the district court under the reasoning set forth in Sandoval, supra, i.e. principles of retroactivity" and "In the alternative, this Court should affirm the decision of the district court under the reasoning expressed in Sandoval v. Reno, et al., 166 F.3d 225 (3d Cir. 1999)." However, Sandoval concerned whether amended S 212(c) could be applied to proceedings pending before AEDPA's effective date and concluded that it could not so apply. See Sandoval, 166 F.3d at 242. This reasoning is irrelevant to DeSousa's case because the INS began his deportation proceedings after AEDPA's effective date. As a result, we cannot affirm the district court's decision based on "the reasoning set forth in Sandoval."

It appears, however, that in the district court, DeSousa had argued that AEDPA was retroactive as applied to him because the underlying criminal convictions rendering him ineligible for discretionary relief occurred prior to AEDPA's effective date. Although DeSousa has failed to raise this

16

issue specifically in his brief argument regarding retroactivity, out of an abundance of caution, we nevertheless address this argument.

The first step in a retroactivity analysis is to determine whether Congress has expressed its views on the temporal reach of the statute. See Sandoval, 166 F.3d at 240 (citing Landgraf v. USI Film Prods., 511 U.S. 244, 280, 114 S.Ct. 1483, 1505 (1994)). If it has, our role is simply to enforce congressional intent. See id.

The text of S 212(c) provides support for the view that pre-AEDPA convictions may be considered in denying relief. The section, as applicable here, provides that waivers will not be available to "an alien who is deportable by reason of having committed any criminal offense." 8 U.S.C. S 1182(c) (1996). The past tense of the underlined verb suggests that on AEDPA's effective date, those who, like DeSousa,"have committed" the specified criminal offense would be ineligible for the waivers.

IIRIRA's amendment of S 212(c) also suggests that Congress intended for earlier convictions to be considered. In S 306(d) of IIRIRA, Congress made a technical correction to S 212(c), and specifically provided that the correction was retroactive to AEDPA's effective date. This correction changed the section's language to provide: "This subsection shall not apply to an alien who is deportable by reason of having committed any criminal offense . . . covered by section 241(a)(2)(A)(ii) for which both predicate offenses are without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i)." IIRIRA S 306(d) (underlined text added by IIRIRA). INA Sections 241(a)(2)(A)(i) and (ii) concern moral turpitude convictions. Importantly, subsection (i) states that an alien is deportable for a single moral turpitude conviction if the conviction occurs within a specified number of years from the date of admission, and the crime carries a potential sentence of one year or more. See 8 U.S.C. S 1227(a)(2)(A)(i).

Given the language of subsection (i), Congress may have intended that the technical correction simply eliminate the requirement that a moral turpitude conviction must have occurred within a specified number of years from

17

admission. On the other hand, given Congress's failure to limit its language, the phrase "without regard to the date of their commission" suggests that any two moral turpitude convictions, even those that pre-date AEDPA, would render an alien ineligible for a waiver.

The inclusion of limiting language in another related AEDPA section provides further evidence that Congress intended amended S 212(c) to apply to individuals with pre-AEDPA convictions. In S 440(f), Congress provided that "[t]he amendments made by subsection (e) shall apply to convictions entered on or after the date of the enactment of this Act . . . ." AEDPA S 440(f). By implication then, we can assume that Congress intended for S 440(d) to apply to all convictions, regardless of their date. See Sandoval, 166 F.3d at 241 ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations and quotation marks omitted).

Even though traditional rules of statutory construction suggest that pre-AEDPA convictions are to be considered in denying waivers, because the evidence is not absolutely clear, we proceed to the next step in the retroactivity analysis, whether the statute has a retroactive effect. See Collins v. Montgomery County Bd. of Prison Inspectors, 176 F.3d 679, 685 (3d Cir. 1999) (en banc); Sandoval , 166 F.3d at 240. On this issue, our precedent requires us tofind that S 212(c) does not have "retroactive effect" even though it removes discretionary relief for pre-AEDPA convictions. See Scheidemann v. INS, 83 F.3d 1517, 1523 (3d Cir. 1996).

In Scheidemann, we considered two separate amendments to S 212(c): the first was the addition of the bar to waiver eligibility for aggravated felons, and the second was an expansion of the definition of "aggravated felony" to encompass a greater variety of crimes. See id. at 1519-20. The petitioner argued that because at the time of his conviction there was no statutory bar to waiver eligibility and his crime was not defined as an aggravated felony, the amendments should not apply to his deportation proceeding even though it was initiated after the effective

date of the amendments. See id. at 1520. Thus, the retroactivity issue before us in Scheidemann was substantively identical to that before us on this appeal.

We resolved this issue by holding that the amendments did not have a retroactive effect. We stated:

> [T]he consequences of petitioner's criminal conduct were clear at the time of that conduct and they remain unchanged today. He was subject to possible criminal sanctions and deportation. The only relevant change in the law relates to the permissible scope of the Attorney General's discretion to grant relief from one of those consequences. Like statutes altering the standards for injunctive relief, this change has only a prospective impact. It is not designed to remedy the past but only to affect petitioner's future status with regard to the legality of his presence in the United States.

Scheidemann, 83 F.3d at 1523. The above reasoning clearly applies to DeSousa's claims on this appeal and therefore requires the finding that amended S 212(c) does not have retroactive effect.

Because S 212(c) does not have retroactive effect, courts construing it should "apply the law in effect at the time . . . [of] decision." Landgraf, 511 U.S. at 264, 114 S.Ct. at 1496. At the time of both the BIA's and the district court's decisions in DeSousa's case, amended S 212(c) was in effect and provided that waivers were unavailable to those aliens who were deportable "by reason of having committed" an aggravated felony or two crimes of moral turpitude. Because DeSousa was deportable by reason of having committed such crimes, the courts correctly found that he was ineligible for a waiver. We therefore reject DeSousa's alternative ground for affirmance.

V. CONCLUSION

We will affirm the district court's ruling that it had habeas jurisdiction to review DeSousa's challenge to his deportation order. Furthermore, we will affirm itsfinding that Congress intended amended S 212(c) to apply to individuals in DeSousa's situation, and as applied,S 212(c)

19

is not retroactive. However, we will reverse the district court's grant of a writ to DeSousa because we conclude that the distinction between excludable and deportable aliens drawn in amended S 212(c) does not violate the equal protection guarantee of the Fifth Amendment's Due Process Clause. Accordingly, we will remand the case to the district court to dismiss DeSousa's petition.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

20